UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

Steven C. Jahn,                                    Case No. 13-11309

      Plaintiff,                                Honorable Nancy G. Edmunds

v.

William T. Farnsworth, et al.,

      Defendants.

_____/

## ORDER GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

Currently before the Court is Defendants William T. Farnsworth, Thomas L. Valko, Patricia L. Speilburg, and Marysville Public Schools' motion for summary judgment. Plaintiff is Steven C. Jahn, father and personal representative of the estate of Steven Jacob Jahn, deceased. Because Plaintiff has not shown that a genuine dispute of material fact exists as to either his procedural due process claim or his substantive due process claim, the Court GRANTS Defendants' motion for summary judgment.

## I.      Facts

This case is about the tragic suicide of Steven Jacob Jahn (Jake), a senior at Marysville High School in Marysville, Michigan. On Monday, March 19, 2012, Jake took his own life after a trying day at school where he was accused of, and admitted to, stealing a teacher's laptop. Defendants had suspended Jake for the theft and released Jake into his father's care. Several hours after Jake arrived home, Jake left his house

without anyone's knowledge and drove his car into a concrete abutment, killing himself. The events leading up to Jake's suicide began on Friday, March 16, 2012.

On Friday, March 16, 2012, Kirk Smith, a teacher at Marysville High School, reported his laptop stolen. (Smith Aff. ¶¶ 2, 3.)  Smith reported the theft to the superintendent, James Cain, and to the assistant superintendent, Patricia Speilburg. (*Id.* at ¶ 6.)  Marysville High School's technology director notified Smith that the laptop's last activity on the network was at approximately 2:58 P.M. (*Id.* at ¶ 7.)  The security footage of the area appeared to show Jake leaving the classroom shortly after the computer was logged off the network. (Pl.'s Resp. Ex. 8.)  Time stamp evidence shows Jake leaving the classroom 20-30 seconds after the computer was "woken up." (Farnsworth Dep. at 7.) No other students were seen leaving the classroom after Jake, and Jake was the only person seen on the tape. (Pl.'s Resp. Ex. 8.)   Bill Farnsworth (Farnsworth), the high school's principal, and Tom Valko (Valko), the assistant principal, decided to bring Jake in for questioning on Monday, March 19, 2012. (Defs.' Mot. Ex. 15 at 1.)

Farnsworth and Valko met with Jake at approximately 11:00 A.M. on Monday, March 19, 2012. (*Id.*)  Farnsworth informed Jake that he was a suspect in the theft of the computer. (*Id.*)  Farnsworth informed Jake of the school's due process procedure and explained the video evidence they had against him. (Farnsworth Dep. at 7.) Jake initially told Farnsworth that he did not take the computer. (*Id.* at 8.)  Farnsworth told Jake that since there was evidence indicating Jake stole the computer, the investigation would continue. (*Id.*)  Jake then informed Farnsworth that he knew who took the computer, and that he could get the computer back. (*Id.*)  Jake provided Farnsworth

with the name of another student, and Farnsworth told Jake that the student would be brought in for questioning. (*Id.*) Jake then admitted that he took the computer. (*Id.*) After Jake admitted that he took the computer, Farnsworth testified that he told Jake that the consequences of the theft would be a ten-day suspension and a recommendation for a long-term suspension.[1] (*Id.* at 6.) Farnsworth and Valko then made a conference call to Jake's father, Steven C. Jahn (Mr. Jahn) in order to retrieve the computer. (Jahn Dep. at 27.) Jake told his father the exact location of the computer, which was in Jake's room. (*Id.*) Mr. Jahn retrieved the laptop and took it to the high school. (*Id.* at 31.)

Mr. Jahn arrived at the school and met with Farnsworth, Valko, and Jake. (*Id.*) The parties dispute what Defendants said in this meeting. Defendants allege that they told Jake and Mr. Jahn that they would suspend Jake for ten days with a recommendation that he be suspended for the rest of the school year. (Valko Dep. at 11.) Plaintiff alleges that Valko and Farnsworth told Mr. Jahn that "Jake was . . . suspended for the remainder of the school year, would be finishing his AP classes from home, and would not be allowed on school grounds for commencement, senior prom, or any other school function." (Jahn Dep. at 42-43.) Plaintiff further alleges that Defendants told Jake that if he did not confess to other thefts, they would turn those cases over to the police and Jake would be the prime suspect. (*Id.* at 33.) Defendants also allegedly told Jake and Mr. Jahn that they would be forced to notify Michigan State University and Wayne State University, two colleges Jake had applied to, of the events that took place. (*Id.* at 40-42.) Defendants insist they did not make those statements.

---

[1] The recommendation in this case was suspension for the remainder of the school year.

After Farnsworth and Valko's discussion with Mr. Jahn and Jake, Valko escorted Jake out of the building. On the way out, Jake became distraught and broke down. (Valko Dep. at 25.) Jake told Valko he was worried because his dad was very angry at him. (*Id.* at 26.) Valko told Jake, "Jake, It's not that he doesn't love you. He doesn't love what you did, you know, at this time, and you'll be fine." (*Id.*) Valko and Jake talked for a few more moments, then Jake shook Valko's hand and thanked him for not involving the police. (*Id.* at 26, 72.) After seeing Jake off, Valko told Mr. Jahn that Jake was upset, and that Mr. Jahn should keep an eye on Jake. (*Id.*) Jake drove himself home and called Mr. Jahn from the driveway. (Jahn Dep. at 25-26.) Mr. Jahn arrived at the house at approximately 12:50 P.M., five minutes after the phone call from Jake. (*Id.* at 26.) From 12:50 P.M. until approximately 4:00 P.M., Jake was in the custody of either his father, or his grandfather, Clifford Jahn. (*Id.* at 47-50, 59-60, 63-64, 66.)

At some point between 4:00 P.M. and 4:30 P.M., Jake took the spare key to his car and drove away from the house without anyone's knowledge. (*Id.* at 68.) Mr. Jahn did not realize Jake was not in the house until approximately 5:20 P.M. (*Id.* at 67.) At approximately 5:00 P.M., a police officer was dispatched to the site of an automobile accident on I-69. (Defs.' Mot. Ex. 17, Police Report.) Witnesses to the accident reported that the vehicle drifted into the median and collided with a concrete pillar. (*Id.*) The vehicle was on fire, and the driver did not get out of the car. (*Id.*) The officer on the scene described the vehicle to Marysville police. (Pl.'s Resp. Ex. 15, Marysville Police Report.) The vehicle came back registered to the Jahn household, and police made contact with Mr. Jahn to inform him of the accident. (*Id.*) The police told Mr. Jahn to call a detective in Lapeer County. (Jahn Dep. at 79.) Mr. Jahn did so, and the detective

4

informed him that Jake was in a fatal automobile accident.  The body was eventually identified as being Jake's, and his death was ruled a suicide. (Defs.' Mot. Ex. 19, Death Certificate.)  Farnsworth called Mr. Jahn that night offering his condolences. (Jahn Dep. at 83.)  Mr. Jahn told Farnsworth that he did not want to talk to him and that there was no reason for Farnsworth to ever call him again. (*Id.* at 83-84.)

Plaintiff filed suit against Defendants alleging (1) Defendants violated Jake's procedural due process rights; (2) Defendants' negligence; (3) Defendants violated Jake's substantive due process rights; and (4) Defendants intentionally or recklessly inflicted emotional distress. (Compl. ¶¶ 37-90.)  The Court dismissed the negligence and intentional or reckless infliction of emotional distress claims without prejudice. (Dkt. 11, Order of Dismissal as to Pl.'s State Law Claims.)  At issue in this case are the two due process claims.

## II.   Legal Standard

### A. Rule 56 summary judgment standard

The Sixth Circuit employs the familiar standard for summary judgment, namely, that summary judgment is proper when the movant "shows that there is no genuine dispute as to any material fact, and that the movant is entitled to judgment as a matter of law." *U.S. SEC v. Sierra Brokerage Services, Inc.*, 712 F.3d 321, 326-27 (6th Cir. 2013) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251–52 (1986)) (quotations omitted). When reviewing the record, "the court must view the evidence in the light most favorable to the non-moving party and draw all reasonable inferences in its favor." *Id.* Furthermore, the "substantive law will identify which facts are material, and summary

5

judgment will not lie if the dispute about a material fact is 'genuine,' that is, if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.*

When considering the material facts on the record, a court must bear in mind that "[t]he mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff." *Anderson*, 477 U.S. at 252.

Moreover, "[i]n order to survive a motion for summary judgment, the non-moving party must be able to show 'sufficient probative evidence [that] would permit a finding in [their] favor on more than mere speculation, conjecture, or fantasy." *Arendale v. City of Memphis*, 519 F.3d 587, 605 (6th Cir. 2008) (citing and quoting *Lewis v. Philip Morris Inc.*, 355 F.3d 515, 533 (6th Cir. 2004)).

## III. Analysis

Plaintiff alleges that Defendants' actions violated Jake's procedural and substantive due process rights.  Defendants argue that they afforded Jake all of the procedural due process to which he was entitled and that they did not violate his substantive due process rights because a cause of action does not exist when a person takes his own life.  Because the Court finds that Jake received all the procedure to which he was entitled, Defendants' actions did not create the danger of Jake's suicide, and Defendants are entitled to qualified immunity, the Court GRANTS Defendants' motion for summary judgment.

### A. Procedural due process

Procedural due process is "a right to a fair procedure or set of procedures before one can be deprived of property by the state." *Seal v. Morgan*, 299 F.3d 567, 574 (5th Cir. 2000).  In a deprivation of schooling situation, when implementing a suspension of ten days or less, due process requires that "the student be given oral or written notice of the charges against him and, if he denies them, an explanation of the evidence the authorities have and an opportunity to present his side of the story. *Goss v. Lopez*, 419 U.S. 565, 581 (1975).  Notice of a suspension need not be formal; a student facing suspension can receive his hearing almost immediately following his misconduct. *Id.* at 582.  Since the hearing can happen so quickly, "as a general rule notice and hearing should precede removal of the student from school." *Id.*  The *Goss* Court did not specifically address what kind of process is due for long suspensions and expulsions. *See Id.* at 584 (longer suspensions or expulsions for the remainder of the school term, or permanently, *may* require more formal procedures) (emphasis added).  The Sixth Circuit has determined that *Goss* sets at least the minimum procedural requirements for expulsion.  *Newsome v. Batavia Local Sch. Dist.*, 842 F.2d 920, 927 (6th Cir. 1988). The Court finds that, even if Jake had been suspended for the remainder of the school year at the time of his death, Jake had received all the process to which he was entitled.

### i. Jake Jahn was given an adequate due process hearing

Due process requires that "the student be given oral or written notice of the charges against him and, if he denies them, an explanation of the evidence the authorities have and an opportunity to present his side of the story." *Goss*, 419 U.S. at

7

581.   Undisputed evidence established that Farnsworth and Valko's questioning of Jake followed the guidelines set forth in *Goss*. (Jahn Dep. at 35) (Plaintiff has no evidence contradicting what happened in Jake's original hearing.)   Farnsworth and Valko called Jake down to the principal's office and informed him of the school's due process procedures, the charges against him, and an explanation of the evidence against him. (Farnsworth Dep. at 5-7.)   Initially, Jake denied the charges. (*Id.* at 7.)   Farnsworth and Valko then reiterated the evidence they had against Jake, and told him the investigation would continue. (*Id.* at 8.)   Jake then informed Farnsworth and Valko that he knew the student that stole the computer, and that he could get the computer back. (*Id.*)  After Farnsworth and Valko said they would have to talk to that student, Jake admitted that he took the computer and knew where it was. (*Id.*)   Jake was given an oral notice of the charges against him, was presented with an explanation of the evidence, and was also allowed to present his side of the story. (*Id.* at 6-8.)   Farnsworth stated that he informed Jake during the hearing that the consequences of the theft would be a ten-day suspension and a recommendation for a long-term suspension. (*Id.* at 6-7.)   Because Farnsworth and Valko's questioning of Jake involved notifying him of the charges against him, an explanation of the evidence against him, and an opportunity for Jake to tell his side of the story, the process Jake received is consistent with the process *Goss* requires.   Because Jake was provided with the process required by law, Plaintiff cannot establish that the initial hearing violated Jake's procedural due process rights.

Plaintiff argues that Defendants' refusal to show Jake the video evidence against him violated his procedural due process rights. (Pl.'s Resp. to Defs.' Mot. for Summ. J. at 15.)   Plaintiff cites to *Newsome v. Batavia Local School District*, 842 F.2d 920 (6th

8

Cir. 1988) in an attempt to support his position.  In *Newsome*, the court held that "[w]hile *Goss* specifically limited itself to the short suspension not exceeding ten days, it nevertheless establishes the minimum requirements for long-term expulsions as well." *Id.* at 922 (citations, quotations, and emphasis omitted).  In *Newsome*, the superintendent disclosed new evidence against the student in closed deliberations after the student's hearing had taken place. *Id.*  The evidence had not been disclosed to the student. *Id.*  Because the evidence was not presented while the student and his attorney were present, the court held that the student did not receive due process. *Id.*

Here, the minimum due process requirements were met.  Farnsworth and Valko explained the evidence they had to Jake. (Farnsworth Dep. at 8.)  After the evidence was explained to Jake, he admitted his guilt. (*Id.*)  According to *Goss*, only an *explanation* of the evidence is required. *Goss*, 419 U.S. at 581 (emphasis added). Because Farnsworth and Valko did not hide evidence from Jake, and in fact provided an explanation of the evidence to him, Defendants did not violate Jake's procedural due process rights by not showing him the video.  Plaintiff cannot rely on *Newsome* to establish a procedural due process violation.

### ii. Jake cannot show he was prejudiced by a lack of process

In order to prevail on a procedural due process challenge, Plaintiff must not just show faulty procedure; he must also show prejudice. *Graham v. Mukasey*, 519 F.3d 546, 549 (6th Cir. 2008).  The merits of a procedural due process claim do not need to be examined if there is no demonstration of prejudice. *Id.*  In order to establish prejudice, Plaintiff "must show that the due process violations led to a substantially different outcome from that which would have occurred in the absence of those

9

violations." *Id.* (citations omitted).  Multiple courts have determined that an admission of guilt is relevant to determine substantial prejudice. *See Keough v. Tate Cnty. Bd. Of Educ.*, 748 F.2d 1077, 1083 (5th Cir. 1984) (substantial evidence to support the court's finding that the student admitted the charges and therefore his suspension did not result from a procedural due process deprivation); *Watson ex rel. Watson v. Beckel*, 242 F.3d 1237, 1242 (10th Cir. 2001) (student admitted to board that he assaulted his roommate because of race; because he candidly admitted guilt, he was not prejudiced by lack of notice); *Boster v. Philpot*, 645 F.Supp. 798, 805 (D. Kan. 1986) ("By admitting their guilt, the plaintiffs waived their right to a hearing."); *see also Kowalski v. Berkeley Cnty. Schs.*, 652 F.3d 565, 576 (4th. Cir. 2011) ("because [the student] admitted her conduct, the administrators were not required to provide a more extensive opportunity to allow her to justify her conduct.").

Theft or possession of stolen property is listed as a major offense in the Marysville High School student handbook. (Defs.' Mot. Ex. 9, Student Handbook/Code of Conduct.)  The handbook states "any student who continually violates school rules, or who commits serious infractions of the rules, are subject to suspension or expulsion from M.H.S." (*Id.*)  The Court finds that Jake's procedural due process claim is undermined because not only did Jake admit that he committed a "major offense" subjecting him to suspension or expulsion, but recovery of the stolen laptop from Jake's house confirmed Jake was guilty of the theft.  Because Jake admitted he was guilty of a major offense that was punishable by suspension or expulsion, Plaintiff cannot show Jake's suspension occurred because of a failure of procedural due process.

### iii. Jake Jahn's death occurred so quickly after his suspension that there is no information regarding what would have happened were he to appeal his punishment

At the time of Jake's death, he had been informed that he was suspended for ten days with a recommendation for a long-term suspension. (Farnsworth Dep. at 6-7.) Jake's death occurred so quickly after his suspension that there was no opportunity for either written notice of the suspension to be sent to his house or Farnsworth's recommendation for long-term suspension to arrive on the desk of the superintendent. (Valko Dep. at 51; Speilburg Dep. at 7.)  An automated letter explaining the suspension had already been created that would be sent to Jake's house. (Defs.' Mot. Ex. 13, Discipline Letter.)  Assuming that Jake was suspended for the remainder of the year during his first due process hearing, Jake and his parents still had the right to appeal his punishment. (Defs.' Mot. Ex. 9, Student Handbook/Code of Conduct.)  Plaintiff concedes that any sort of appeal attempt that would have taken place had Jake not committed suicide on March 19 is hypothetical. (Jahn Dep. at 100.)  Plaintiff cannot use speculation to show a due process violation. *See Williams v. Bass*, 63 F.3d 483, 485 (6th Cir. 1995) (because no authority was cited for the proposition that a speculative injury provides due process protection, it is doubtful that the plaintiff had a cognizable due process claim).  The Court does not have any information regarding what would have occurred in Plaintiff's hypothetical appeal, and the Court cannot use speculation to find a procedural due process violation.  Because Plaintiff does not show evidence that his appeal would have been denied and Defendants' actions comported to the minimum standards set forth in *Goss*, Plaintiff has not shown a procedural due process violation.

### iv. Jake's suspension for the remainder of the school year did not violate his procedural due process rights

Even if the Court were to conclude that Jake was suspended for the remainder of the school year immediately following his hearing with Farnsworth and Valko, his procedural due process rights were not violated. Farnsworth and Valko did not coerce Jake's confession, Jake's suspension was not tantamount to expulsion, and Jake and his stepmother had previously indicated that they understood the regulations contained in the student handbook, which include the procedures for suspension and expulsion.

Plaintiff argues that Defendants Farnsworth and Valko pressured and coerced Jake into making his confession. The duration of Jake's original hearing is disputed. Defendant Farnsworth estimates the original hearing lasted from forty-five minutes to an hour. (Defs.' Mot. Ex. 15, Farnsworth Statement.) Plaintiff says the hearing lasted "an hour or two hours." (Jahn Dep. at 35.) After Jake was escorted off of school grounds, Farnsworth told Mr. Jahn "well, it's obvious I had to work on him for a while. Your son is very cold, calculating, and unremorseful." (Jahn Dep. at 45.) While the Court acknowledges that statement was made, Plaintiff puts forth no evidence of what actually occurred during Jake's original due process hearing.[2] (Jahn Dep. at 35.) Defendants' statements that they were going to notify Marysville Police and Michigan State University and their statement that Jake would have a felony on his record were not made until after Jake had confessed to stealing the laptop.[3] (Pl.'s Resp. at 2-3; Pl.'s Resp. Ex. 6, Jahn Aff ¶¶ 2-3, 7, 14; Jahn Dep. 32-34, 40-42.) Although those

---

[2] Mr. Jahn testified that he did not know what was said when Farnsworth and Valko were with Jake, and he still does not know what was said.

[3] All mentions of notifying Michigan State University or the Marysville Police in the record occur after Jake's initial hearing, and coincide with Defendants Farnsworth and Valko trying to get Jake to confess to other thefts. In the statement of facts in Plaintiff's brief, Plaintiff alleges that Farnsworth and Valko only mentioned notifying colleges or the police after Jake admitted to taking the computer.

statements may have been coercive, Jake did not admit to taking any other items. (Jahn Dep. at 33.)  As stated above, according to the only evidence of Jake's original hearing, Defendants Farnsworth and Valko provided Jake with the process to which he was due, and did not use coercive methods to obtain his confession.

Although Jake may have been suspended for the remainder of the school year, he had not been expelled.  The evidence indicates that at most, Jake was suspended for the remainder of the school year following his initial due process hearing. (Pl.'s Resp. Ex. 17) (Spielburg email stating Jake "will be suspended through the rest of 2011-2012."); (Pl.'s Resp. Ex. 18) (Spielburg email stating Jake "will be suspended for the rest of the school year…"); (Pl.'s Resp. Ex. 19) (Smith was told Jake was suspended for the remainder of the school year.)  While the Sixth Circuit has entertained de facto expulsion arguments, a de facto expulsion is only recognized when the restriction at issue is tantamount to permanent and complete expulsion from the school system. *See G.C. v. Owensboro Pub. Schs.*, 711 F.3d 623, 631 (6th. Cir. 2013) (citing cases for proposition).  The Court finds Jake's suspension was not tantamount to permanent and complete expulsion from Marysville Public Schools.  Jake only needed a half credit to finish his high school degree. (Jahn Dep. at 44.)  Plaintiff understood that Defendants were going to allow Jake to receive and complete homework assignments at home, finish his classes, and graduate with a Marysville High School diploma. (Jahn Dep. at 43-44, Farnsworth Dep. at 27-28.)  The circumstances of Jake's punishment show that Jake's suspension was not tantamount to an expulsion.[4]  *Newsome* dictates that "[a]

---

[4] Jake's punishment may not have even met the Sixth Circuit's definition of "suspension." The Sixth Circuit has reasoned that a "suspension" from school entails "banishment from the school building, and all of its educational

student faced with *expulsion* has the right to a *pre-expulsion* hearing before an impartial trier-of-fact…" *Newsome*, 842 F.2d at 927 (emphasis added).  Because Jake was only facing suspension, he did not have a right to the type of hearing *Newsome* requires for expulsions.

Even if Farnsworth and Valko told Jake's parents he was suspended for the remainder of the school year, Jake's procedural due process rights were not violated. Jake and his stepmother, Crystal Jahn, still had a right to appeal his punishment.  The Marysville High School student handbook contains information regarding the procedure taken in the event of a suspension or expulsion. (Defs.' Mot. Ex. 9, Student Handbook.) The handbook explicitly states in italicized and underlined text that "[a]ll students will be afforded all due process rights and appeal procedures. . ." (*Id.*)  Both Jake and Crystal Jahn signed a form indicating that they had reviewed and understood the rules, regulations, and student expectations of the student handbook. (Defs.' Mot. Ex. 10, Acknowledgement Form.)  The handbook was also available for review online. (*Id*; C. Jahn Dep. at 11.)  Even if Defendants Farnsworth and Valko told Jake's parents that he was suspended for the remainder of the year and there was nothing they could do, the statements do not violate Jake's due process because Jake and Crystal Jahn acknowledged they understood the contents of the student handbook, and the handbook explicitly stated every student was to be afforded all due process rights and appeal procedures, including the procedures regarding appealing suspensions and expulsions.  Because Jake and Crystal Jahn acknowledged that they had understood the rules, regulations, and student expectations of the handbook, they knew or should

opportunities and options." *Wayne v. Shadowden*, 15 F. App'x 271, 274 n.2 (6th Cir. 2001).  Jake was not banished from all educational opportunities and options; he was going to be able to complete classes and get his diploma.

have known of Jake's right to appeal his suspension. *See Washington v. Comcast Corp.*, 268 F. App'x 423, 429 (6th Cir. 2008) (employer was within its rights to terminate employment pursuant to rules set forth in the employee handbook); *See also Kowalski*, 652 F.3d at 569, 575 (4th Cir. 2011) (finding that a student who received a student handbook at the beginning of the school year was adequately put on notice of the policies contained in the handbook).

The facts of this case show that Jake had received all the process to which he was entitled.  As mentioned above, Jake received the process to which he was due in his original hearing with Farnsworth and Valko.  Jake's admission of guilt was not coerced, and his admission combined with the recovery of the stolen laptop confirming his guilt makes it unlikely that Plaintiff was prejudiced by any lack of process.  Both Jake and his stepmother were on notice of their ability to appeal the suspension. Because Jake died so quickly after his suspension, there can only be speculation as to what would have happened had he chosen to appeal.  Jake did not have the right to a separate hearing before an impartial trier of fact, because he was not expelled from school.  Because Jake had received all the process to which he was entitled, Plaintiff's procedural due process claim fails.

### B. Substantive due process

Substantive due process prevents "governmental power from being used for purposes of oppression, regardless of the fairness of the procedures used." *LaHaie v. DeAngelo*, No. 13-10250, 2013 WL 6801144 at *3 (E.D. Mich. Dec. 23, 2013) (external citations and quotations omitted).  An executive actor violates the substantive

component of the due process clause when the action "can properly be characterized as arbitrary, or conscience shocking, in a constitutional sense." *County of Sacramento v. Lewis*, 523 U.S. 833, 847 (1998).  The Due Process Clause applies to expulsion from school where a state has conferred a property interest in a public education. *Goss*, 419 U.S. at 572-74.

Generally, "a State's failure to protect an individual against private violence simply does not constitute a violation of the due process clause." *DeShaney v. Winnebago Cnty. Dep't of Soc. Servs.*, 489 U.S. 189, 197 (1989).  The Sixth Circuit recognizes two exceptions to this rule: the custody exception and the state created danger exception. *Carver v. City of Cincinnati*, 474 F.3d 283, 286 (6th Cir. 2007). "[O]fficials and municipalities are liable under § 1983 only for injuries that they directly cause, unless one of the two *DeShaney* exceptions imposes a duty to protect from private violence." *Cutlip v. City of Toledo*, 488 F. App'x 107, 115 (6th Cir. 2012).  The custody exception does not apply here; Plaintiff argues that Defendants created the danger of Jake's suicide. (Compl. at ¶ 66.)  A state created danger claim has three elements:

> 1) an affirmative act by the state which either created or increased the risk that the plaintiff would be exposed to an act of violence by a third party; (2) a special danger to the plaintiff wherein the state's actions placed the plaintiff specifically at risk, as distinguished from a risk that affects the public at large; and (3) the state knew or should have known that its actions specifically endangered the plaintiff.

*Estate of Smithers ex rel. Norris v. City of Flint*, 602 F.3d 758, 763 (6th Cir. 2010).  The Sixth Circuit has never found liability under the state created danger doctrine when the victim has committed suicide. *Cutlip*, 488 F. App'x at 113.  In cases outside the Sixth Circuit, courts have only found liability when school officials or police officers were

16

responsible for the suicide. *See Armijo v. Wagon Mound Pub. Schs.*, 159 F.3d 1253, 1256 (10th Cir. 1998) (school officials sent a special education student who had previously talked of suicide home without notifying his parents of his removal from school); *Sloane v. Kanawha Cnty. Sheriff Dep't*, 342 F. Supp. 2d 545, 547-48 (S.D. W. Va. 2004) (police officers continued interrogating a minor after one officer stated he was worried the minor would feel "he was up against a wall" and become suicidal).

Plaintiff argues that Defendants' actions violated Jake's substantive due process rights by creating the danger of Jake's suicide. (Compl. at ¶ 66.) Defendants argue that the Sixth Circuit has never held the state liable for a suicide under the state created danger theory, and that Plaintiff has not shown all three elements of a state created danger claim.

### i. The Sixth Circuit has not recognized liability under the state created danger doctrine when a person commits suicide

The Sixth Circuit is reluctant to find liability for suicide under the state created danger theory. "When a victim bears some responsibility for the risks she has incurred, it is even more difficult to say that the state has created the danger to her by its affirmative acts." *Jones v. Reynolds*, 438 F.3d 685, 694 (6th Cir. 2006). In fact:

> The Sixth Circuit has never found liability under the state-created-danger doctrine where the victim committed suicide, and indeed, although a number of courts have considered the state-created-danger doctrine within the context of suicide, the primary cases that have found or seriously entertained liability have involved the suicide of minors where school officials or police were in some way responsible. *See, e.g., Armijo v. Wagon Mount Pub. Schs.*, 159 F.3d 1253, 1262-64 (10th Cir. 1998); *Sloane v. Kanawha Cnty. Sheriff Dep't*, 342 F.Supp.2d 545, 553 (S.D.W.V. 2004).

*Cutlip*, 488 F. App'x at 115. The Sixth Circuit reasoned:

17

As a general principle, people cannot violate their own constitutional rights, and where a person makes a free and affirmative choice to end his life, the responsibility for his actions remains with him. That a state official somehow contributed to a person's decision to commit suicide does not transform the victim into the state's agent of his own destruction."

*Cutlip*, 488 F. App'x at 116.

Plaintiff cites multiple cases to support the proposition that Defendants are liable for Jake's death under the state created danger doctrine.  Plaintiff relies heavily on *Armijo*, considering it "one of the leading cases on the state created danger issue." (Pl.'s Resp. at 31.)  *Armijo* involved a special education student with a history of depression and impulsive behavior. *Armijo*, 159 F.3d at 1256. The student had repeatedly threatened self-harm to school officials. *Id.*  School employees also knew that the student had access to firearms. *Id.*  The student was then sent home without notifying his parents, in violation of school disciplinary policy. *Id.* at 1257.  The student's parents returned home to find he had already committed suicide. *Id.*  The Tenth Circuit held that because there was enough evidence that two defendants put the student in substantial risk of serious harm and had some knowledge that might support an inference the student was suicidal, the defendants' motion for summary judgment was properly denied. *Id.* at 1264.  Despite Plaintiff's assertions about *Armijo*, multiple circuits consider *Armijo* an outlier. *See Hasenfus v. LaJunesse*, 175 F.3d 68, 74 (1st Cir. 1999) ("if sound, the Tenth Circuit decision is at the outer limit"); *Martin v. Shwano-Gresham Sch. Dist.*, 295 F.3d 701, 711 (7th. Cir. 2002) (noting *Armijo*'s limited application); *See also* Cutlip, 488 F. App'x At 115-16 (noting *Armijo* seems to be an outlier and finding that in most cases the municipality did not create the danger to the student).  Plaintiff also relies on *Sloane* and *Kerns v. Independent Sch. Dist. No. 31 of Ottawa Cnty.*, ___

18

F.Supp.2d __, 2013 WL 5903632 (N.D. Okla. Oct. 31, 2013) to support his state created danger claim.  The Court finds that the facts in the cited cases are distinguishable from the facts in this case.

In *Sloane*, police officers interrogated a minor while he was outside the presence of his legal guardians.  *Sloane*, 342 F. Supp.2d at 547-48.  The police officers took the minor in for a second interrogation two days later, again without his legal guardians.  *Id.* The interrogation took place even though one of the officers was worried that the minor "might feel he was up against a wall" and become suicidal.  *Id.*  The minor was interrogated a third time a few days later.  *Id.*  The minor's guardians were still not present, but a counselor was allowed to be present.  *Id.*  The counselor left the room for a polygraph test.  *Id.*  During the test, the officers put a chair in front of the door to prevent him from leaving and put him between a desk and a wall.  *Id.*  The officers then pressured the minor into writing an apology to the alleged victim.  *Id.*  The officers implied that the minor would be arrested, and the minor became suicidal and was driven home by his counselor.  *Id.*  The minor committed suicide that night; it was later found out that the minor was not guilty of any crimes.  *Id.*  The West Virginia district court held:

> when a state actor takes actions (actions that, as discussed below, may themselves be unconstitutional) against an emotionally disturbed minor that the state actor knows will create or substantially enhance the risk that the minor will harm himself, and then fails to take any steps to mitigate that risk, he is subject to liability under 42 U.S.C. § 1983 pursuant to a theory of causation and duty premised on the state-created danger doctrine.

*Id.* at 553.

*Kerns* involved a seventeen year old student who was caught drinking alcohol on school grounds.  *Kerns v. Independent Sch. Dist. No. 31 of Ottawa Cnty.*, __ F.Supp.2d __, 2013 WL 5903632 at *1 (N.D. Okla. Oct. 31, 2013).  The supervising teachers

became aware the student was intoxicated, and they suspended the student for the remainder of the school year. *Id.* Teachers noted that the student was "extremely upset and still intoxicated." *Id.* The defendant teacher directed two other students to drive the intoxicated student home and did not inform the intoxicated student's parents of the situation. *Id.* The intoxicated student was able to get into the driver's seat and drive away. *Id.* The student died in a one-vehicle car accident caused "in whole or in part" by the student's "intoxicated and emotional state." *Id.* The *Kerns* court decided that the allegations set forth were enough to survive a motion to dismiss, because the allegations stated a "plausible claim of danger creation under Tenth Circuit law." *Id.* at *3.

Plaintiff's cited cases are all distinguishable from this case. All Plaintiff's cited cases involve minors with a known mental instability: *Armijo* considered a special education student with depression that had made previous suicidal threats to school staff; *Sloane* considered a minor who was repeatedly interrogated even though one of the officers was concerned the minor might become suicidal; and *Kerns* involved administrators removing an intoxicated and extremely upset minor student from school grounds. In *Armijo* and *Kerns* the parents were never notified of their child's suspension at any point before the child's suicide.

Plaintiff's case is not factually similar to his illustrative cases. By all reports and Plaintiff's admission, Jake Jahn was a well-adjusted young man. (Compl. ¶ 15.) Neither Defendants nor Jake's family had any idea at any point that Jake was considering suicide. (Jahn Dep. at 108) (Mr. Jahn knew Jake better than anyone and didn't see anything wrong with him other than Jake being quiet); (Valko Dep. at 42, 72) (Mr. Valko

did not believe Jake was suicidal, and did not indicate he was going to harm himself.) While Jake was sent home by himself, Mr. Jahn knew Jake had left the school, and Mr. Jahn arrived home minutes after Jake. (Jahn Dep. at 26.)  Jake was then under the supervision of his family until he left his house without their knowledge.  (*Id.* at 47-50, 59-60, 63-64, 66.)  In both *Armijo* and *Kerns*, school officials knowingly sent a mentally unstable student home without any sort of parental supervision.  Jake Jahn's father was notified of Jake's suspension, came up to talk to Jake, and took custody of Jake from the time of the suspension until the time Jake left his house without anyone's knowledge. (*Id.*)  Sending a student home after a suspension under the expectation that he will be in the custody of the people who know him best does not shock the conscience, nor does it create the danger of the student committing suicide.

Because the Court does not apply the state created danger doctrine to find Defendants liable for Jake's suicide, Plaintiff cannot show a substantive due process violation.

### ii. Defendants' conduct towards Jake did not create the danger of Jake's suicide.

Were the Court to apply the state created danger doctrine in this case, Plaintiff would still be unable to show Defendants violated Jake's substantive due process rights.  A state created danger claim has three elements:

> (1) an affirmative act by the state which either created or increased the risk that the plaintiff would be exposed to an act of violence by a third party; (2) a special danger to the plaintiff wherein the state's actions placed the plaintiff specifically at risk, as distinguished from a risk that affects the public at large; and (3) the state knew or should have known that its actions specifically endangered the plaintiff.

*Estate of Smithers ex rel. Norris v. City of Flint*, 602 F.3d 758, 763 (6th Cir. 2010).

Plaintiff cannot show all three elements of the claim.

Plaintiff claims Defendants took affirmative actions that created the risk of Jake's suicide by: (1) telling Jake they had a snapshot of him with the laptop, when they in fact only had a video; (2) telling Jake that if he did not confess to other thefts, they would turn the matter over to the police with Jake being the prime suspect; (3) telling Jake that when he was convicted of the other thefts, he would have a felony on his record; (4) telling Jake that they would have to notify any colleges or scholarships Jake had applied for of the theft; and (5) Defendant Valko allowing Jake to leave the school grounds alone. (Jahn Dep. at 32-33, 40-41, 45; Pl.'s Resp. Ex. 10 at 2.)  Plaintiff claims those affirmative actions created the danger of Jake's suicide. (Pl.'s Resp. to Defs.' Mot. for Summ. J. at 32.)  Plaintiff also claims that Defendants created or increased the danger of Jake's suicide by not initiating the school's lockdown procedure as it applies to suicide threats. (*Id.*)

Although Farnsworth and Valko's statements to Jake and his family may have lacked wisdom and compassion, those comments are not sufficient to create a claim. The Sixth Circuit has recognized:

> It is not the role of the federal courts to set aside decisions of school administrators which the court may view as lacking a basis in wisdom or compassion. . . . The system of public education that has evolved in this Nation relies necessarily upon the discretion and judgment of school administrators and school board members, and § 1983 was not intended to be a vehicle for federal-court corrections of errors in the exercise of that discretion which do not rise to the level of violations of specific constitutional guarantees.

*Lowery v. Euverard*, 497 F.3d 584, 589 (6th. Cir. 2007) (citing *Wood v. Strickland*, 420

U.S. 308, 326 (1975)).  Pursuant to *Goss*, Jake was only entitled to an explanation of

the evidence; he was not entitled to view the evidence. *Goss*, 419 U.S. at 591. The

administrators were allowed to use their discretion to determine how to conduct Jake's

process hearing.

Plaintiff claims that Farnsworth and Valko indicated that they would be compelled

to notify Michigan State University of what had transpired. Plaintiff claims Farnsworth

and Valko:

> …went back to talking, telling Jake he needs to admit to these other items or
> they're going to turn it over to the Marysville Police for prosecuting.  They told –
> expressed to Jake that because of his situation, and it would be on his record,
> they'd have to notify the school he applied to and scholarships what had
> transpired that day.

(Jahn Dep. at 40-41.) Plaintiff claims the rest of the conversation was:

> Tom Valko and Bill Farnsworth trying to get him [Jake] to admit to these other
> items, bringing up that he probably won't go to be – they're going to let Wayne
> State – or Michigan State, these other schools, the scholarships he applied to,
> know what he had done and that he needs to admit to these other items.

(*Id.* at 42.)  Later testimony from school superintendent James Cain indicated "it

wouldn't be typical for school administration to call a university and tell them that one of

our students is suspended. I don't know how that would happen." (Pl.'s Resp. Ex. 2,

Cain Dep. at 51-52.)

Plaintiff contends that Defendants should have initiated their suicide threat

lockdown policy instead of letting Jake leave school grounds.  Plaintiff claims that

Defendants should have referred Jake to a counselor or to the emergency room for

treatment, and also called 911. (Pl.'s Resp. to Defs.' Mot. for Summ. J. at 4.)  Neither

Plaintiff nor Defendants had reason to believe Jake was suicidal. (Jahn Dep. at 108; Valko Dep. at 39, 42, 72.)  The lockdown policy is only activated once a student talks of suicide. (Pl.'s Resp. Ex. 12, Suicide Threat.)  Because Jake did not talk of suicide, Defendants were under no duty to lock down the school.  Moreover, other circuits have noted that "due process protects people from being unlawfully restrained; it provides no right to be restrained, lawfully or otherwise." *Shawano-Gresham*, 295 F.3d at 709 (citing *Collignon v. Milwaukee Cnty.*, 163 F.3d 982 (7th Cir. 1998) (holding plaintiffs cannot claim that the county defendants should have involuntarily committed [decedent] to a mental health facility).

Case law is scant on whether false statements like the ones Farnsworth and Valko made to Jake can be considered to create the danger of a suicide.  The Court assumes for the sake of argument that there is a fact question as to whether the statements met the first element of a state created danger claim.

If the Court determines that Plaintiff has shown the first element of a state created danger claim, the second element is likely met.  Defendants' actions were all directed specifically toward Jake.  Jake's suspension and Defendants' alleged comments to Jake and Mr. Jahn affected Jake specifically, and did not create a danger to the public at large.

Even if the first two elements of a state created danger claim are met, the third element is not.  Defendants did not know or have reason to know their actions specifically endangered Jake such that he would commit suicide.  Plaintiff was not aware of Jake's suicidal intentions. (Jahn Dep. at 108.)  Defendant Valko was the last

Defendant to see Jake alive, and also did not think Jake was suicidal. (Valko Dep. at 39, 42, 72) (testifying that there was no suicide threat, it was normal for students to get upset for being in trouble, and that Jake never said he was suicidal or planning to hurt himself.)  Although Jake "broke down" in front of Valko, the only testimony concerning that "break down" indicates the "break down" took place because Jake was worried that his dad was angry with him. (*Id.* at 26-27.)  According to the only testimony of Valko's discussion with Jake, the conversation following Jake's "break down" ended with a handshake and Jake thanking Valko for not calling the police. (*Id.* at 73.)

Plaintiff argues that Jake's "break down" in front of Valko should have initiated a lockdown procedure from the school. (Pl.'s Resp. to Defs.' Mot for Summ. J. at 32.) Plaintiff's argument fails.  The suicide threat procedures are only activated once a student talks of suicide. (Pl.'s Resp. Ex. 12, Suicide Threat.)  Jake never indicated a suicidal ideation to Defendants or to Mr. Jahn. (Jahn Dep. at 108); (Valko Dep. at 39, 42, 72.) Even if Valko still thought Jake was emotionally fragile, he did not have an affirmative duty to act. *See Shawano-Gresham*, 295 F.3d at 710 (the alleged knowledge of a fragile emotional state is irrelevant for purposes of the due process clause).  Since Jake did not threaten suicide and Defendants had no reason to know of any suicidal intent by Jake, Plaintiff is incorrect in asserting that a lockdown procedure should have taken place.  Following Plaintiff's logic, administrators would have to lock down the school for a suicide threat any time a high school student had a break down.  Mr. Jahn knew Jake "as well or better than anybody else in the world," and he did not think Jake was suicidal even after Jake returned home. (Jahn Dep. at 108.)  Because neither Plaintiff nor Defendants had any idea of Jake's suicidal intentions, the Court cannot

conclude Defendants knew or should have known that their actions specifically endangered Jake or created the danger of his suicide.  Because Plaintiff cannot show all three elements of a state created danger claim, the claim fails.

### C. Qualified immunity

Qualified immunity protects "[g]overnment officials performing discretionary functions" from liability for civil damages so long as their conduct "does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Poe v. Haydon*, 853 F.2d 418, 423 (6th. Cir. 1988) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)).  Qualified immunity provides immunity from suit rather than immunity from liability. *Pearson v. Callahan*, 555 U.S. 223, 231 (2009).  Qualified immunity analysis requires a two-step inquiry.  First, the Court asks whether the facts, viewed in the light most favorable to the plaintiff, show a violation of a constitutional right.  Second, the Court asks whether the right at issue was "clearly established" at the time of the defendant's alleged misconduct. *Cochran v. Gilliam,* 656 F.3d 300, 306 (6th Cir. 2011) (citing *Saucier v. Katz*, 533 U.S. 194, 201 (2001)).  For a right to be clearly established, "the contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Leonard v. Robinson*, 477 F.3d 347, 355 (6th. Cir. 2007) (external citations omitted).

Plaintiff argues that Jake's procedural due process rights were violated because Defendants suspended him for the remainder of the school year without a formal hearing.  Plaintiff also argues that Jake's substantive due process rights were violated because Defendants created the danger of his suicide.  Defendants argue that they are

protected by qualified immunity because Plaintiff has not shown that a constitutional right was violated, and alternatively, that the right was not firmly established at the time of Defendants' conduct.  The Court finds that qualified immunity shields the individual Defendants against Plaintiff's claims.

Here, as the Court has already shown, no constitutional violations took place. But, even if a constitutional violation occurred, Plaintiff has not shown that the constitutional right was clearly established.

There is no clearly established constitutional right to a formal hearing before a long-term suspension from school.  The Supreme Court has specifically chosen not to address long-term suspensions or expulsions, instead stating "[l]onger suspensions or expulsions for the remainder of the school term, or permanently, *may* require more formal procedures. *Id.* at 584. (emphasis added).  The Sixth Circuit has held that "[a] student faced with *expulsion* has the right to a pre-expulsion hearing before an impartial trier-of-fact – he does not have the right to a full-blown administrative appellate process." *Newsome*, 842 F.2d at 927. (emphasis added).  *Newsome* only discusses what rights a student has when faced with expulsion; *Newsome* does not discuss the rights of a student facing a long-term suspension.  Because Plaintiff has not shown a violation of a clearly established constitutional right, Defendants are entitled to qualified immunity as to the procedural due process claim.

Defendants are also entitled to qualified immunity as to the substantive due process claim.  There is no clearly established law holding a school district employee liable for a student's suicide occurring outside of the school after the student has been

released into the custody of his parents or legal guardians.  In fact, the Sixth Circuit has never found liability for a suicide under the state created danger theory.  Because Defendants did not violate a clearly established constitutional right, they are entitled to qualified immunity as to the substantive due process claim.

### D. Municipal Liability

A suit against a school district and its employees in their official capacity constitutes a suit against the school district only.  "[A] suit against a state official in his or her official capacity is not a suit against the official but rather is a suit against the official's office.  As such, it is no different from a suit against the State itself." *Will v. Michigan Dep't of State Police*, 491 U.S. 58, 71 (1989) (citations omitted).  A municipal liability claim "must be examined by applying a two-pronged inquiry: (1) [w]hether the plaintiff has asserted the deprivation of a constitutional right at all; and (2) [w]hether the [municipality] is responsible for that violation." *Doe v. Claiborne Cnty., Tenn.*, 103 F.3d 495, 505-06 (6th. Cir. 1996).  "A plaintiff who sues a municipality for a constitutional violation under § 1983 must prove that the municipality's policy or custom caused the alleged injury." *Ellis v. Cleveland Mun. Sch. Dist.*, 455 F.3d 690, 700 (6th Cir. 2006) (citing *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 690-91 (1978)).  The Court finds Defendant Marysville Public Schools is not liable for Jake's suicide because Jake's suicide was not caused by Defendant Marysville Public Schools' policies or customs.

Marysville Public Schools maintains due process policies consistent with *Goss* and *Newsome*. (Defs.' Mot. Ex. 11, Policy/Guidelines.)  The school also had a crisis management policy addressing suicide threats at school. (Defs.'s Ex. 18, Suicide

Threat.)  Because the due process policies are consistent with constitutional requirements and, as stated above, neither party had reason to believe the suicide threat policy should have been enacted, no Marysville Public Schools policy caused Jake's suicide.

A "custom" that shows liability under § 1983 "must be so permanent and well settled as to constitute a custom or usage with the force of law." *Claiborne Cnty.*, 103 F.3d at 507 (citing *Monell*, 436 U.S. at 691.)  "In turn, the notion of 'law' must 'include deeply embedded traditional ways of carrying out state policy.'" *Id.* at 103 F.3d at 507 (quoting *Nashville, Chattanooga & St. Louis Ry. Co. v. Browning*, 301 U.S. 362, 369 (1940)).  Custom "must reflect a course of action deliberately chosen from various alternatives." *Id.* at 508.  To establish that Defendant Marysville Public Schools maintains a custom of inaction that caused a constitutional deprivation, Plaintiff must show:

> (1) the existence of a clear and persistent pattern of [a violation of constitutional rights]; (2) notice or constructive notice on the part of the School Board; (3) The School Board's tacit approval of the unconstitutional conduct, such that their deliberate indifference in their failure to act can be said to amount to an official policy of inaction; and (4) that the School Board's custom was the "moving force" or direct causal link in the constitutional deprivation.

*Claiborne Cnty.* at 508.  "'Deliberate indifference' in this context does not mean a collection of sloppy, or even reckless, oversights; it means evidence showing an obvious, deliberate indifference to [a constitutional violation]." *Id.*

Plaintiff puts forth no evidence that there was a pattern of constitutional violations, either substantive or procedural.  There is also no evidence of other suicides at the school stemming from suspensions.  Because Plaintiff has not shown Marysville

Public Schools' policies or customs caused Jake's suicide, Defendant Marysville Public Schools is not liable.

## IV.    Conclusion

Because Jake Jahn received adequate procedural due process at the time of his suspension, and Defendants' actions did not violate Jake's substantive due process rights by creating the danger of his suicide, Plaintiff has not shown that there is a genuine dispute of material fact for of his § 1983 due process claims.  For these reasons and the reasons stated above, the Court GRANTS Defendants' motion for summary judgment.

So ordered.

s/Nancy G. Edmunds
Nancy G. Edmunds
United States District Judge

Dated:  July 16, 2014

I hereby certify that a copy of the foregoing document was served upon counsel of record on July 16, 2014, by electronic and/or ordinary mail.

s/Carol J. Bethel
Case Manager